**In re APEX OIL COMPANY, et al., Debtors.**

**APEX OIL COMPANY, et al., Debtors,**

**v.**

**UNITED STATES CUSTOMS SERVICE, Claimant.**

Bankruptcy Nos. 87–03804–BSS, 87–03804–BKC–BSS.
Claim No. 1362.
Claim Objection No. 1078.

United States Bankruptcy Court, E.D. Missouri, E.D.

Dec. 5, 1990.

Frederick J. Dana, Asst. U.S. Atty., St. Louis, Mo., Michele L. Kenney, Office of Asst. Chief Counsel, U.S. Customs Service, Indianapolis, Ind., for claimant.

John A. Moe, II, John P. Kreis, Gendel, Raskoff, Shapiro & Quittner, Los Angeles, Cal., for debtors.

Steven N. Cousins, David L. Going, Frederick H. Mayer, Armstrong, Teasdale, Schlafly, Davis & Dicus, St. Louis, Mo., for Unsecured Creditors Committee.

William H. Bode, William H. Bode & Associates, Washington, D.C.

Robert H. Brownlee, Thompson & Mitchell, St. Louis, Mo., for Chemical Bank.

## MEMORANDUM OPINION AND ORDER

BARRY S. SCHERMER, Bankruptcy Judge.

### INTRODUCTION

This case arises from the objection of debtor Apex Oil Company ("Apex") to the claim of the United States Customs Service ("Customs"). The issues in this case are derived from the importation of petroleum products and a dispute as to their country of origin. This case presents two issues: 1) Whether this Court has and should exercise jurisdiction over the liquidation of pre-petition claims of Customs, despite the exclusive jurisdiction granted the Court of International Trade ("CIT") in 28 U.S.C. § 1581(a); and 2) Whether Customs' post-petition liquidation of claims against Apex constituted a violation of the automatic stay.

### JURISDICTION

This Court has jurisdiction over the subject matter of the proceeding pursuant to 28 U.S.C. §§ 151, 157, 1334, and Local Rule 29 of the United States District Court for

the Eastern District of Missouri. The parties have stipulated that this is a "core proceeding" which this Court may hear and enter appropriate judgments pursuant to 28 U.S.C. § 157(b)(2)(B).

## FACTS

I. An Overview of the Customs Process As It Relates to the Instant Case

### A. *The Payment Prerequisites Necessary to Invoke CIT Jurisdiction*

[1, 2] The parties do not dispute the key elements necessary to invoke the jurisdiction of the Court of International Trade ("CIT"). As provided by statute, Apex must prepay 100% of Customs' claim into the CIT in order to invoke that court's jurisdiction (the "Prepayment Requirement"). The pertinent statute states:

> A civil action contesting the denial of a protest under Section 515 of the Tariff Act of 1930 may be commenced in the Court of International Trade *only if all liquidated duties, charges, or exactions have been paid at the time the action is commenced,* except that a surety's obligation to pay such liquidated duties, charges, or exactions is limited to the sum of any bond related to each entry included in the denied protest.
>
> 28 U.S.C. § 2637(a) (emphasis added).

Accordingly, the CIT has construed prepayment of all amounts claimed by Customs to be a condition precedent to its subject matter jurisdiction. *Glamorise Foundations, Inc. v. United States,* 661 F.Supp. 630, 632 (Ct.Int'l. Trade 1987). Not even the Government can waive this prepayment requirement. *American Parcel Forwarding v. United States,* 718 F.2d 1546, 1550 (5th Cir.1983), *cert. denied,* 466 U.S. 937, 104 S.Ct. 1909, 80 L.Ed.2d 458 (1984). In addition, courts interpreting Section 2637(a) must construe its provisions strictly and may not imply exceptions through use of equitable principles. *Glamorise,* 661 F.Supp. at 632–33 (quoting and interpreting *NEC Corp. v. United States,* 806 F.2d 247, 249 (Fed.Cir.1986)).

Courts have held that Congress intended the prepayment requirements in 28 U.S.C.

§ 2637(a) to be construed literally. *See Penrod Drilling Co. v. United States,* 727 F.Supp. 1463, 1465 (Ct.Int'l Trade 1989); *Nature's Farm Products, Inc. v. United States,* 819 F.2d 1127 (Fed.Cir.1987); *Parcel Forwarding,* 718 F.2d at 1551, *relying on Jerlian Watch Co. v. United States,* 597 F.2d 687, 692 (9th Cir.1979). The sole exception to the prepayment rule is when, as of the initiation of CIT litigation, Customs already has on hand funds owing to an importer which are sufficient to cover the amounts claimed. *Dynasty Footwear v. United States,* 551 F.Supp. 1138 (Ct.Int'l Trade 1982). However, this exception is not applicable to the instant case.

### B. *Liquidation and Drawbacks*

In order to determine conclusively an importer's financial liability for imported goods, Customs must liquidate its entries against the importer. However, upon paying the liquidated amount, the importer may apply for a drawback, which essentially is a refund of any overpayment it has made.

#### 1. Liquidation

Apex asserts that Customs' post-petition liquidation of some of its claims (against Apex) constituted a violation of the automatic stay. The term "liquidation", as it is used in the Customs context, is defined in Customs Regulations as "the final computation or ascertainment of the duties or drawback accruing on an entry". 19 CFR § 159.1. Liquidation becomes final only upon the expiration of specific time periods during which the entry can be reliquidated:

1. to correct errors in appraisement or classification;
2. to correct clerical errors or mistakes of fact adverse to the importer;
3. in cases where fraud is suspected; or
4. pursuant to a valid protest.

*See* 19 CFR §§ 173.3, 173.4, 173.6. Additionally, finality of liquidation is subject to judicial review upon timely application from the denial of a valid protest. 19 CFR § 174.31.

If Customs fails to liquidate entries within specified time limits, those entries are

deemed liquidated at the rate of duty, value, quantity, and amount of duties asserted at the time of entry by the importer of record. 19 U.S.C. § 1504. The general time limit for liquidation is one year from the date of entry. However, Section 1504 permits Customs to extend that period in one year increments (not to exceed three additional years) if, among other things, information is needed for proper appraisement or classification of the merchandise is not available to the appropriate customs officer. Section 1504(d) provides that any entry not liquidated at the expiration of four years from the date of entry is deemed liquidated at the initially asserted amount of duty, unless liquidation is suspended by court order or statute.

### 2. Drawbacks

A "drawback" is a refund of duties paid on an entry because of the use made of the entered merchandise. The process of liquidation for drawback entries is different than with usual entries of merchandise. Normally in a situation where a drawback is claimed an importer will import merchandise that may be used in manufacturing other goods, which are then exported, or the imported goods are exported in the same condition. However, in the case of drawback entries Customs' regulations allow the importer to claim a refund on the duties paid on the imported merchandise to the extent it is exported and not used within the United States before such exportation. 19 CFR § 191.1–191.166.

Pursuant to 19 CFR § 191.72, a drawback claimant is eligible for accelerated payment of its drawback on claims which are properly prepared and submitted pursuant to Customs regulations. To obtain accelerated payment the claimant must file with the drawback claim a computation of the refund amount due and submit a bond covering the amount of potential drawback due. After a brief review, the regional commissioner certifies the claim for payment within three weeks after filing. After liquidation, the regional commissioner

will certify payment of any additional amount due to the claimant or demand payment of any excess amount refunded to the claimant.

In liquidating a drawback claim, the drawback specialist may sometimes be called upon to audit the drawback claim. The audit will culminate in a report which will contain a recommendation with respect to the liquidation of the specific drawback entry and also may contain recommendations with respect to future drawback claims by the same claimant. Where an audit is conducted on a drawback claim for any of the above reasons, liquidation on the entry is suspended until the audit is completed and the audit report in issued. When the drawback specialist receives a copy of the audit report, she will liquidate the drawback entry according to the recommendation in the audit report. There is no discretion given to the drawback specialist in such a situation, the results of the audit are controlling for the purposes of liquidation. In addition to liquidation of the drawback claim, the audit report may also recommend that future information submitted by the respective claimant is not to be considered reliable.

## II. The Instant Case

In its Seventh Amended Proof of Claim, filed on January 11, 1990, Customs claimed the following amounts:

| Amount | Categorization |
|---|---|
| $1,388,925.89 | Drawbacks (2) |
| 76,791.89 | Interest |
| 23,576.64 | Supplemental Duties |
| 1,414,193.24 | Penalties |
| 329,971.67 | Loss of Duties Due to Fraud |
| $3,233,459.33[1] | |

Customs' claim arises from the following facts. In 1984, Clark Oil and Refining Corporation ("Clark") submitted a drawback claim on behalf of Apex. Accelerated payment was applied for and received by Apex. Customs conducted an audit on this claim and suspended liquidation pending

---

**1.** The Court is unable to explain the disparity between this total and the amount submitted on Customs' Seventh Amended Proof of Claim— $3,344,202.52.

Of the sum claimed, Customs has asserted $353,548.31 as a priority pursuant to Section 507(a)(7)(F)(iii) of the Bankruptcy Code.

issuance of the audit report. The audit report concluded that the transactions included in the drawback were conducted neither as reported to Customs nor as required by pertinent Customs regulations. Therefore, the report recommended both that the drawback should not be allowed and that information submitted by Clark or Apex in future drawback entries should not be considered reliable.

On the basis of the audit report, which was issued in September 1986, the drawback specialist liquidated the entry, with the drawback disallowed, on November 7, 1986. The drawback claim was stamped with this notation and Apex was notified that it owed $726,703.48. Customs denied Apex's timely protest on January 17, 1989.

While this audit was pending, Clark submitted another drawback claim on January 9, 1985, for which accelerated payment was received by Apex in the amount of $662,-222.41. Liquidation of the entry was suspended pending the result of the audit. After Customs' audit of the drawback entry, number 85–7500698 was liquidated by the drawback specialist on September 9, 1988, with no drawback allowed due to the insufficiency of the documentation submitted and the audit report.[2] Once the drawback was liquidated, Apex was notified of the action and the $662,222.41 it owed Customs.

In addition to the drawback claims, Customs also levied two supplemental duties against Apex which involved the importation of fuel oil. Supplemental duty number 84–1698969 was liquidated in the amount of $13,465.03 on May 6, 1988, while Customs liquidated number 85–1883861 in the amount of $10,111.61 on June 3, 1988. Liquidation on these two entries was suspended on the basis of an on-going fraud investigation pursuant to 19 CFR § 162.80(a)(1). Subsection (2)(ii) of this section provides that entries not liquidated within four years from the date of entry will be deemed liquidated at the rate of duty, value, quantity, and amount of duties asserted at the time of entry by the importer. Just prior to the expiration of the four year

limit, the import specialist assigned to the entries liquidated them at a higher duty rate based on the results of the fraud investigation. The Report of Investigation concluded that the merchandise in question was of Soviet origin rather than from the United Kingdom, as was indicated on the entry documents submitted by Apex. Based on this information, the duty amount was recalculated at the duty rate for fuel oil of Class II Countries. Apex was notified of this action and the amount due.

On September 27, 1989, Apex objected to Customs' Fifth Amended Proof of Claim. After a hearing, this Court entered its Memorandum Opinion and Order ("Order"). Both parties appealed the decision and on February 27, 1990 this Court entered its order approving the parties' stipulation for reconsideration of the Order. Thus, this Court must now determine 1) whether it has and, if so, should exercise jurisdiction, and 2) whether Customs' post-petition liquidation of the claims violated the automatic stay.

### I. Jurisdiction of the Bankruptcy Court

Regarding the issue of jurisdiction, Apex has asserted several arguments. First, Apex contends that 28 U.S.C. § 1334(b) gives this Court jurisdiction over "core proceedings", as defined in 28 U.S.C. § 157(b)(2). Given that this involves a core proceeding—the liquidation of a claim—the plain language of Section 1334(b) mandates that this Court dispose of the case. In addition, Apex argues that it would be unfair to other creditors to allow Customs to receive in advance money it is allegedly owed and then have its case adjudicated in the more hospitable CIT. Second, because Customs has filed a claim against the bankruptcy estate, Apex argues that it has repeatedly consented to the jurisdiction of this Court. Thus, this Court has jurisdiction pursuant to *Granfinanciera v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), and *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). Finally, Apex argues that deferral

---

**2.** Neither Apex nor Clark protested the liqui-   dation of this drawback.

to CIT jurisdiction and its prepayment requirement would undermine its recently confirmed plan of reorganization (the "Plan").[3] That is, Customs must be paid in accordance with the Plan, which the CIT's prepayment requirement makes impossible.[4] In addition, Apex asserts that deferral to CIT jurisdiction would greatly delay administration of the Plan and cause needless expense and collateral litigation. In short, Apex urges this Court to assume jurisdiction of this action, as it did in a previous case involving the United States Department of Energy ("DOE"). *See In re Apex Oil Co.*, 91 B.R. 860 (Bankr.E.D.Mo. 1988) (Court stayed proceedings involving the DOE and agreed to estimate those claims).

Customs has offered three responses to Apex's jurisdictional arguments. First, it has stipulated that it will receive only that amount which it would otherwise receive under the Plan. Second, Customs stipulated that placement of any money due in an escrow account will satisfy the CIT's prepayment requirement. Third, any delay caused through CIT jurisdiction might be circumvented by 28 U.S.C. § 1657 and Rules 40, 77(e)(3), and 78, each of which aid in providing for good cause the expedited hearing and review of civil actions.

## II. The Automatic Stay

Addressing the issue of Customs' alleged violation of the automatic stay, Customs offered three arguments. First, Customs states that rather than an effort to harass the debtor, its liquidation of claims was merely an effort to ascertain the amount of the duties owed. This was necessary, it argues, in order to file its claim and/or to know whether it had to file a claim at all. Second, Customs argues that there is no violation of the automatic stay because Customs' liquidation of its claim is merely a ministerial action that amounts only to a notice of liability. Thus, it stands in sharp contrast to the actions taken in the *Apex*

*Oil, supra,* which this Court found violative of the automatic stay. Finally, Customs argues that even if there exists a violation of the stay, such violation is excepted under Section 362(b)(9), which permits a governmental unit to issue to the debtor a notice of tax deficiency. While Customs' claim surely does not arise out of a tax context, Customs likens such duties to tax deficiency notices in that they are little more than calculations and notices of amounts owed.

In its original and reply briefs Apex asserts the following arguments. First, relying on *State of Missouri v. U.S. Bankruptcy Court*, 647 F.2d 768 (8th Cir.1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982), Apex contends that Customs' actions are not excepted from the automatic stay because they were not intended to protect public health, welfare, and safety, as provided in Section 362(b)(4). Specifically, it relies on the court's holding that a regulatory law that "directly conflicts with the control of the *res* or property" is outside the police power of this Section. 647 F.2d at 776. In addition, the court cited legislative history indicating that Congress intended the police and regulatory exceptions should be narrowly construed. *Id.* Second, Apex also relies on this Court's *Apex Oil* decision, in which the Court stated that further liquidation of a claim by an agency is prohibited unless directed at protecting health, safety or welfare. Because Customs' purpose is pecuniary, its actions therefore fall outside of this exception. Third, Apex states that further liquidation of the claim was not necessary because the definition of "claim" contained in Section 101(4) includes a right to payment that is unliquidated. Fourth, Apex contends that Customs' actions are hardly ministerial as they may have adverse consequences, such as a resulting final determination if Apex fails to act within ninety days after the administrative liquidation. Finally, Apex asserts that Customs' analogy to a notice of tax

---

3. On August 16, 1990, this Court issued its Amended Opinion and Order of Confirmation approving Apex's plan of reorganization.

4. Apex also states that the fate of any prepaid money would be unknown and depends largely upon the interpretation of its Plan, which is exclusively the province of this Court.

deficiency fails to qualify as a Section 362(b)(9) exception and no court has held that customs duties are such a functional equivalent.

## DISCUSSION

### I. Jurisdiction

#### A. *The Existence of Jurisdiction*

Pursuant to 28 U.S.C. § 1581(a):

The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or part, under section 515 of the Tariff Act of 1930.

However, 28 U.S.C. § 1334(b) states:

*Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts,* the district court shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11. (emphasis added).

Finally, 28 U.S.C. § 157(a) provides for the referral of "any or all cases under title 11 and any or all proceedings arising under title 11" to the bankruptcy judges in that district. Given the conflicting language of the above provisions, this Court must determine whether it has jurisdiction to hear the instant action.

Several cases exist in which bankruptcy court jurisdiction conflicted with statutes granting another tribunal exclusive jurisdiction to hear that action. These cases concluded that despite the existence of a statute that grants another tribunal exclusive jurisdiction, 28 U.S.C. § 1334(b) granted the bankruptcy court concurrent jurisdiction. *See, e.g., Brock v. Morysville Body Works, Inc.,* 829 F.2d 383, 385 (3rd Cir.1987) (Occupational Safety and Health Act); *In re Iverson,* 108 B.R. 272, 273–74 (Bankr.D.Or.1989) (Commodity Credit Corporation Charter Act). However, courts have held that the fact that the bankruptcy court enjoys concurrent jurisdiction in no way divests the alternative tribunal of its

jurisdiction. *See MCorp Financial v. Board of Governors,* 900 F.2d 852, 855 (5th Cir.1990); *Brock,* 829 F.2d at 385.

■■■ This Court agrees with the conclusion reached by the *Brock* and *Iverson* courts. In addition, this Court finds two other reasons why it has jurisdiction to hear this case. First, the express language of Section 1334(b) plainly states that despite the existence of another statute granting exclusive jurisdiction, the district court may hear any case arising under or related to a Chapter 11 proceeding. This provision is made applicable to the the the bankruptcy courts through 28 U.S.C. §§ 157(b)(1) and (2), which give such courts jurisdiction over "core proceedings" and allow them to enter final orders.[5] Second, Customs' submission of a proof of claim indicates that it has consented to the jurisdiction of this Court. In *Katchen v. Landy,* 382 U.S. 323, 335, 86 S.Ct. 467, 475, 15 L.Ed.2d 391 (1966), the Supreme Court adopted the following rationale articulated in *Alexander v. Hillman,* 296 U.S. 222, 241–42, 56 S.Ct. 204, 210–11, 80 L.Ed. 192 (1935): "By presenting their claims respondents subjected themselves to all the consequences that attach to an appearance". The *Katchen* Court further stated:

[O]ur decision is governed by the 'traditional bankruptcy law that he who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that proceeding'. 382 U.S. at 333 fn. 9, 86 S.Ct. at 474 fn. 9 (citation omitted).

The Supreme Court has followed this pre-Code maxim most recently in the context of whether a party is entitled to a jury trial in the bankruptcy court. *See Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 2799, 106 L.Ed.2d 26 (1989); *Langenkamp v. Culp,* — U.S. ——, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990) (per curiam). This Court finds that it applies with equal force in the instant case. Thus, based on the plain language of 28 U.S.C.

---

**5.** If the matter were non-core, 28 U.S.C. § 157(c)(1) provides that the bankruptcy court may hear the case and shall submit proposed findings of fact and conclusions of law to the district court, which may enter a final order after de novo review.

§ 1334(b), other courts' interpretations of that provision, and Customs' submission of a proof of claim, this Court concludes that it has jurisdiction to hear this action.

### B. *Whether to Exercise Jurisdiction*

■ Having concluded that it has jurisdiction over the instant case, this Court must determine whether to exercise such jurisdiction or refer the proceeding to the CIT. Pursuant to 28 U.S.C. § 1334(c)(1), a district court may abstain from hearing a particular title 11 proceeding "in the interest of justice, or in the interest of comity with State courts or respect for State law". Thus, while a bankruptcy court may have jurisdiction to hear a case, Section 1334(c)(1) affords that court a discretionary right to abstain.

Apex has argued that deferral of this case to the CIT would undermine its recently confirmed Plan. While this general contention has many subarguments, Apex's main concern appears to be that such a deferral would inordinately delay the final liquidation of Customs' claim and therefore hinder or delay distribution to its other creditors. This Court finds such a concern appropriate for judicial review. Indeed, other courts have viewed the possibility of delay as a determinative factor in deciding whether to refer a case to another tribunal. *See In re Prudential Lines, Inc.,* 79 B.R. 167 (Bankr.S.D.N.Y.1987); *Brock v. Morysville Body Works, Inc.,* 829 F.2d 383 (3rd Cir.1987).

■ The concern surrounding the delay that would result from liquidation of a claim in another forum is most analogous to an estimation of claims pursuant to Section 502(c)(1). Under this provision a court may estimate any contingent or unliquidated claim that would "unduly delay the administration of the case". This Court believes that this standard is also applicable in determining whether to refer a proceeding to another tribunal, as it involves issues of judicial economy. Thus, if liquidation of a claim in another forum would unduly delay the administration of the case in any way, the proceeding should not be transferred to that forum.

In support of its contention that litigation in the CIT would generate delay, Apex relies almost exclusively on the statements of Leo M. Gordon, an Assistant Clerk in the CIT. Apex claims that in a conversation with Mary White, counsel for Apex, Mr. Gordon stated that an adjudication in the CIT could take between ten to fifteen years. However, in an affidavit attached to Customs' Reply Brief, Mr. Gordon denies ever having made such a statement. Other than this disputed evidence, Apex has offered nothing to support its claim that liquidation of Customs' claim in the CIT will in any way unduly delay the administration of the estate. In addition, Customs has cited various rules and statutory provisions that would expedite final claim liquidation. Thus, the absence of evidence of undue delay, the existence of provisions for an expedited hearing, coupled with the CIT's greater expertise in Customs matters [6], convince this Court that the CIT is the most appropriate forum for liquidation of Customs' claim.[7]

## II. Violation of the Automatic Stay

■ The remaining issue is whether Customs' post-petition liquidation of its claims against Apex constituted a violation of the automatic stay. Section 362(a)(1) prohibits the commencement or continuation of any proceeding to recover a claim against the debtor that arose prior to the commencement of the bankruptcy case. Thus, at first blush it appears that Customs' pursuit

---

**6.** *See In re Prudential Lines, Inc.,* 79 B.R. 167 (Bankr.S.D.N.Y.1987), where the court referred to the Maritime Subsidy Board ("MSB") those issues in which the MSB enjoyed particular expertise.

**7.** Apex has also argued that the prepayment requirement of 28 U.S.C. § 2637(a) would undermine the Plan in that it would make impossible both an equal distribution as to all creditors and payment to Customs in accordance with the Plan. In response, Customs has stipulated that it will only receive that amount of any judgment as allowed by the plan of reorganization, and has agreed that placement of money in an escrow account shall satisfy 28 U.S.C. § 2637(a). The Court deems Customs' responses sufficient to assuage Apex's concerns.

of its claims against Apex were stayed as of December 24, 1987, the date it filed for protection under title 11. However, Customs has offered three reasons why its post-petition liquidation of its claim did not violate the automatic stay. First, Customs argues that rather than intending to harass the debtor, it was merely ascertaining the amount of its duties, which was necessary in order to know whether it should file a claim at all. This Court finds this argument flawed because a claim, as defined in Section 101(4)(A), includes any right to payment, whether liquidated or unliquidated. Thus, Customs could have filed its claim without knowing the exact amount which it was owed. If it eventually learned that it was owed nothing, Customs would have a claim allowed at zero for distribution purposes.

Second, Customs contends that there was no violation of the stay because its claim liquidation was merely a ministerial action designed to provide Apex with the amount it owed. This Court agrees with Apex that Customs' actions were certainly anything but ministerial. Pursuant to 19 U.S.C. § 1514(a)(5):

> [D]ecisions of the appropriate customs officer … as to
>
> (5) the liquidation or reliquidation of an entry, or any modification thereof;
>
> shall be final and conclusive upon all persons (including the United States and any officer thereof) unless a protest is filed….

Section 1514(c)(2) requires that such a protest must be filed within ninety days after the notice of liquidation. Thus, should Apex fail to protest Customs' liquidation within ninety days, the liquidation becomes a final, unreviewable determination. Such consequences can scarcely be derivative of a mere "ministerial action" which is exempt from the purview of the automatic stay.

Finally, Customs argues that even if its post-petition claim liquidation violates Section 362(a), its actions are excepted pursuant to Section 362(b)(9), which allows a governmental unit to give notice of a tax deficiency. While certainly not strictly a tax deficiency, Customs argues that the issuance of import duties is the functional equivalent of the issuance of a tax duty, as both comprise a notice of deficiency and a supporting calculation. While Customs has cited two cases that construe broadly Section 362(b)(9), see *In re H & H Beverage Distrib.*, 850 F.2d 165 (3rd Cir.), *cert. denied*, 488 U.S. 994, 109 S.Ct. 560, 102 L.Ed.2d 586 (1988); *In re Fasgo*, 1986 W.L. 10817 (E.D.Pa.1986), both involve state taxes. Customs has cited no case which holds that the assessment of import duties is the functional equivalent a tax deficiency assessment for purposes of Section 362(b)(9). This Court declines to read into the statute that which is not present in its plain language. Thus, Customs' post-petition claim liquidation is not excepted from the automatic stay provision.[8]

## CONCLUSION

This Court has jurisdiction to hear the instant proceeding. However, because there is no evidence that liquidation of Customs' claim in the CIT would unduly delay the administration of the estate, this Court abstains from hearing this proceeding and refers it to that tribunal for final liquidation. Because Customs' post-petition liquidation of its claims was not excepted from the automatic stay, all actions after December 24, 1987 (the date of Apex's filing) taken by Customs were in violation of the automatic stay. Accordingly, it is

ORDERED that Customs' Seventh Amended Claim is referred to the Court of International Trade for final liquidation;

IT IS FURTHER ORDERED that all actions taken by the United States Customs Service after December 24, 1987 are null

---

**8.** This Court might also add that Customs' action are not excepted under Section 362(b)(4), as the collection of import duties is nothing more than a pecuniary exercise that is in no way designed to protect public health, safety or welfare. *See State of Missouri v. United States Bankruptcy Court*, 647 F.2d 768 (8th Cir.1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982); *In re Commonwealth Companies*, 913 F.2d 518, 523–25 (8th Cir.1990).

and void and the parties shall be returned to their status as of that date.